UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| CENTRAL MIDWEST REGIONAL<br>COUNCIL OF CARPENTERS,<br><br>  Plaintiff,<br><br>  v.<br><br>DOREL JUVENILE GROUP, INC., et al.,<br><br>  Defendants. | )<br>)<br>)<br>)<br>)<br>)  No. 1:24-cv-00806-SEB-MJD<br>)<br>)<br>)<br>)<br>) |

**ORDER DENYING DEFENDANTS' MOTION FOR JUDGMENT
ON THE PLEADINGS**

Now before the Court is Defendants' Motion for Judgment on the Pleadings [Dkt. 18]. Plaintiff Central Midwest Regional Council of Carpenters (the "Union") brings this action against Defendants Dorel Juvenile Group, Inc. and Dorel Design and Development, LLC (collectively, "Dorel") under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185 *et seq.*, alleging that Defendants breached their Collective Bargaining Agreement ("CBA") with the Union by notifying the Union's "retired members" of Defendants' prospective termination of certain company-paid benefits. Plaintiff seeks a declaratory judgment that the CBA was breached, a permanent injunction preventing termination of the benefits alleged, and compulsory arbitration of its claims. For the reasons detailed below, we <u>DENY</u> Defendants' Motion for Judgment on the Pleadings.

1

## Factual Background

The Union represents over 35,000 professional tradespeople in 36 locals in Indiana, Ohio, and Kentucky and is an affiliated subsidiary of the United Brotherhood of Carpenters and Joiners of America.  Dorel Industries, Inc. is a global organization, operating two distinct businesses in juvenile products and home products.  Dorel Indiana is a jointly operated juvenile products division of Dorel Industries, Inc. that operates a manufacturing plant located in Columbus, Indiana.  The Union represents all the hourly production, maintenance, truck drivers, and warehouse employees at the Columbus plant, apart from all salaried, non-exempt and exempt supervisors, office clerical, technical, and professional positions as defined under the National Labor Relations Act ("NLRA").

At all times relevant to this litigation, the Union and Defendants have been signatories to a CBA, the most recent version of which is attached to the complaint, and is in effect from September 25, 2023 to September 28, 2026.  Compl. ¶ 7.  No prior versions of the CBA are attached to the complaint or a part of the pleadings.

The CBA is a contract between the parties that governs the wages, working hours, and other terms and conditions of employment for current employees at Defendants' Columbus, Indiana, facility.  *Id.* ¶ 8.  The CBA also contains contractual provisions for the benefit of former employees of Defendants who meet certain eligibility criteria specified therein.  *Id.* ¶ 9.  Specifically, Article X of the CBA entitled "INSURANCE" states at Section 1 as follows:

> The Company agrees during the term of this agreement, it shall keep in full force and effect life, accidental death and dismemberment, hospitalization, surgical, major medical and the other related benefit policies and plans as

2

> outlined in the Plan Document(s).  It is understood that all Casual Employees who obtain a regular position will be entitled to the benefits and will be issued a Benefit Summary and Booklet-Certificate describing the benefits available. The policy(s) or plan document(s) which are described in the Booklet-Certificate are determinative as to all matters contained therein, including the handling of claims and the payment of benefits.  A copy of the most recent policy(s) or plan document(s) will be furnished to the Union Business representative.

*Id.* ¶ 10; Exh. A to Compl. at Article X, Section 1.

Article X, Section 6 of the CBA further provides that employees meeting the eligibility requirements will be provided: (1) a company paid special insurance plan that is a supplement to full Medicare coverage when they reach age 65, with qualifying employees who retired prior to August 1, 2016 paying 20% toward the monthly cost for a supplemental insurance plan; and/or (2) a fixed monthly retirement stipend toward the monthly cost of a Medicare supplement based on years worked for any employee who retired on August 1, 2022 or earlier (the "Medicare Supplement").  Compl. ¶¶ 11, 12; Exh. A to Compl. at Article X, Section 6.  Employees retiring on or after August 2, 2022 are not entitled to these benefits.  Exh. A to Compl. at Article X, Section 6.

Specifically, Article X, Section 6 of the CBA states as follows:

> Those employees who retired at age 65 prior to August 1, 2016, with at least five years of vesting service, (the five year vesting requirement applies to employees hired after 7-27-98 and who took early retirement with at least ten (10) years of credited service worked after attaining age 45 or retire with a disability pension with at least 10 years of credited service either worked or received as a disability pension retiree after age 45 will be provided a company paid special insurance plan which is a supplement to full Medicare coverage when they reach age 65 with Qualifying employees who retired prior to August 1, 2016 will pay 20% towards the monthly cost for a supplemental insurance plan.  Qualifying employees who retired prior to August 1, 2016 will pay 20% towards the monthly cost for a supplemental insurance plan.

3

> Through and including August 1, 2022, employees who retire at age 65 with at least five years vesting service or employees who take early retirement with at least ten (10) years of credited service or retire with a disability pension with at least 10 years of credited service either worked or received as a disability pension retiree will be offered a fixed monthly retirement stipend toward the monthly cost of a Medicare supplement of the employee's choosing based upon the following years of service:
>
> > 10 to 15 years of service $75 per month
> > 15+ to 20 years of service $100 per month
> > 20+ to 30 years of service $125 per month
> > 30 or more years of service $150 per month
>
> This benefit will no longer be offered by the Company to those employees who retire on or after August 2, 2022.
>
> However, eligible employees will be permitted to maintain their selected supplement at their expense (100% of cost). Employees who retired at age 65 prior to August 1, 2016 shall be allowed to continue in the Medicare Supplement plan or elect to receive the fixed monthly retirement stipend.
>
> Employees who retired at age 65 prior to August 1, 2016 shall be allowed to continue in the Medicare Supplement plan or elect to receive the fixed monthly retirement stipend.

Exh. A to Compl. at Article X, Section 6.

On October 13, 2023, Defendants sent notice to the Union's retiree members via regular mail that, effective January 1, 2025, Defendants would stop providing to all retiree members the benefits outlined in Article X, Section 6, regardless of whether the retiree members had previously fulfilled the conditions required to be eligible for those benefits. Compl. ¶ 13. This led to a dispute between the Union and Defendants over whether Defendants' unilateral termination of the Medicare Supplement for all retirees (which the parties agree affects 132 individuals (the "Retirees")) violates the CBA. The Union believes that the dispute is within the CBA's four-step grievance procedure which

4

states in part: "Should differences arise between the Company and the Union or any employee of the Company covered hereunder as to the meaning or application of the provisions of this Agreement, such differences shall be settled [through the grievance procedure]."  Exh. A to Compl. at Article IX, Section 1.

On November 10, 2023, the Union filed a grievance under Step 1 of the grievance procedure, alleging that Defendants "violated the CBA by announcing that [they were] terminating the Medicare supplement program and contributions, monthly stipend amounts (termed as HRA monthly stipend) and basic life insurance and violation of Article X of the CBA effective 1/1/25."  Exh. B. to Compl.; *see also* Compl. ¶¶ 14, 15; After proceeding through the various levels of the grievance process and having its grievance denied at each step, the Union demanded arbitration.  Compl. ¶¶ 15–23.  On January 3, 2024, Defendants informed the Union via letter that they refused to participate in arbitration as there was "no arbitrable dispute in this matter," *id.* ¶ 24, because "it does not involve members or member benefits under the CBA" and "[t]he only individuals impacted by the grieved benefit changes are those that were currently retired, former employees at the time the changes were implemented."  Exh. C to Compl. (emphasis removed).

On May 13, 2024, the Union filed a two-count complaint pursuant to § 301 of the LMRA, 29 U.S.C. § 185, seeking a declaratory judgment that Defendants breached the CBA (Count I), or, alternatively, to compel arbitration (Count II).  Defendants seek judgment on the pleadings on the grounds that the Union lacks standing to sue and cannot pursue the relief it seeks.

5

## Legal Analysis

### I.     Rule 12(c) Standard

Defendants have moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) on the grounds that the Union lacks standing and cannot pursue the relief it seeks in the complaint.  Under Rule 12(c), "a party may move for judgment" once "the pleadings are closed," so long as such motion is brought early enough not to delay trial. Fed. R. Civ. P. 12(c).  Where, as here, a Rule 12(c) motion raises procedural defenses, courts apply the same standard as a motion to dismiss for failure to state a claim under Rule 12(b)(6).  *Alexander v. City of Chicago*, 994 F.2d 333, 336 (7th Cir. 1993); *Adams v. City of Indianapolis*, 742 F.3d 720, 727–28 (7th Cir. 2014).

"Like Rule 12(b) motions, courts grant Rule 12(c) motions only if 'it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief.'"  *N. Indiana Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 452 (7th Cir. 1998) (quoting *Craigs, Inc. v. Gen. Elec. Cap. Corp.*, 12 F.3d 686, 688 (7th Cir. 1993)).  The moving party must, therefore, "demonstrate that there are no material issues of fact to be resolved." *Id.*  In reviewing "the complaint, the answer, and any written instruments attached as exhibits," we must take the facts in the light most favorable to the nonmoving party. *Id.*; *e.g.*, *Unite Here Local 1 v. Hyatt Corp.*, 862 F.3d 588, 595 (7th Cir. 2017).

### II.    Article III Standing

#### A. Applicable Legal Standard

Standing is "the threshold question in every federal case" that not only "imports justiciability," *Warth v. Seldin*, 422 U.S. 490, 498 (1975), but that also comprises "an essential component of [Article III's] case-or-controversy requirement," *Flynn v. FCA US LLC*, 39 F.4th 946, 952 (7th Cir. 2022) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "[T]he 'irreducible constitutional minimum' of standing consists of three elements." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan*, 504 U.S. at 560). To establish Article III standing, "a plaintiff must show that (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the is fairly traceable to the challenged conduct of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (citing *Lujan*, 504 U.S. at 560–61).

When a party asserts that a plaintiff has not "sufficiently *alleged* a basis of subject matter jurisdiction," we "must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff." *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015) (citing *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443–44 (7th Cir. 2009)). Nonetheless, "each element of standing must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." *Id.* (alterations omitted) (quoting *Lujan*, 504 U.S. at 561). When a party contends that "'there is *in fact* no subject matter jurisdiction,' even if the pleadings are formally sufficient," we "may look beyond the pleadings and view any evidence submitted to determine if subject

matter jurisdiction exists." *Id.* Here, Defendants allege that the Union has not established standing under either standard.

### B. The Current CBA Is Implicated

Defendants' principal argument is that, because the Retirees had already retired at the time the current CBA was signed, they were never employed under the current version of the CBA, never accrued or earned benefits under that CBA, and thus, insofar as the Retirees' rights are concerned, it is not the operative agreement. Rather, Defendants argue, it is the expired CBA(s) under which a given individual retired that would determine whether unilateral changes may be made to the Retirees' health benefits, and those agreements have not been pled in this lawsuit.

Defendants contend, therefore, that the Union does not have standing to litigate the § 301 declaratory judgment claim or compel arbitration as pled in the complaint because the complaint alleges that Defendants have violated only the current CBA, effective September 25, 2023 through September 28, 2026, which does not cover the Retirees. According to Defendants, because the Retirees have no rights under the current CBA and the Union has not alleged that any rights to health care benefits that the Retirees may have been promised under prior CBAs are vested so as to create contractual obligations to the Retirees that survive their respective retirements or the expired CBAs, the Union has no standing to sue or compel arbitration under § 301, either on behalf of the Retirees or in its own stead.

While it is true, as Defendants argue, that "[r]etired employees are no longer in a bargaining unit," and thus retirees' benefits are not a mandatory but rather a permissive

subject of bargaining, the "union and employer may [still] bargain (if they choose) over benefits that the retirees will receive." *Lid Elec., Inc. v. Int'l Broth. of Elec. Workers, Local 134*, 362 F.3d 940, 943 (7th Cir. 2004) (citing *Chemical Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157 (1971)).  The Union alleges that the parties did just that here, by including provisions in the current CBA, set forth in Article X, Section 6, which pertain to health benefits for former employees who retired prior to the effective date of the CBA.  Compl. ¶ 9 ("The CBA negotiated between the parties contains contractual provisions for the benefit of former employees of Defendants who meet certain eligibility criterion specified therein.").

Because the Union has alleged that the parties negotiated to include provisions regarding health benefits for already-retired individuals in the *current* CBA, to wit, Article X, Section 6, the current CBA *is* the operative contract in this case.  See *Kop-Flex Emerson Power Transmission Corp. v. Int'l Ass'n of Machinists and Aerospace Workers Local Lodge No. 1784*, 840 F. Supp. 2d 885, 890–94 (D. Md. 2012).  Thus, to the extent that Defendants contend that the Union lacks standing because it has sued under the wrong CBA, we are not persuaded by that argument.

### C. Section 301 Declaratory Judgment Claim

Having determined that the CBA is the operative contract, we find for the following reasons that the Union has standing to bring the claim alleged in Count I of its complaint, which seeks a declaratory judgment under § 301 of the LMRA that Defendants have violated Article X, Section 6 of the CBA by unilaterally eliminating the

9

provisions relating to the Retirees' subsidies for health care and the supplemental insurance plan.

      Section 301(a) of the LMRA provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction over the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a). The Union argues that it has independent standing to bring this cause of action in its own stead because it has alleged that it is a statutory labor organization and that Defendants are a statutory employer within the meaning of § 301 of the LMRA, that they are parties to a current CBA, which agreement promises health benefits to individuals who retired prior to the effective date of the CBA after fulfilling certain conditions of employment, and that Defendants have breached those provisions. Because it is a party to the CBA, the Union argues that Defendants' unilateral discontinuation of the promised health benefit to the Retirees covered in Article X, Section 6 will injure the Union, depriving it of the benefit of its bargain.

    The Union's contention that it has a clear institutional interest in vindicating its members' rights[1] under a contract it obtained through collective bargaining is supported both in the caselaw and the language of the LMRA, which "explicitly provides that a union may sue or be sued 'as an entity.'" *Boeing Co. v. March*, 656 F. Supp. 2d 837, 848

---

[1] In response to Defendants' claim that union membership is an element of a § 301 claim, the Union has submitted evidence that at least some of the retirees affected by Defendants' cessation of retirement benefits remain members of the Union.

(N.D. Ill. 2009) (quoting 29 U.S.C. § 185(b)).  Where, as is alleged here, an employer has agreed by contract with a union to provide benefits to retirees, "then under accepted contract principles the union has a legitimate interest in protecting the rights of the retirees and is entitled to seek enforcement of the applicable contract provisions." *United Steelworkers of Am., AFL-CIO v. Canron, Inc.*, 580 F.2d 77, 80–81 (3d Cir. 1978); *see also Frontier Commc'ns of N.Y., Inc. v. Electrical Workers IBEW Local 503*, No 07 Civ. 10327 (GEL), 2008 WL 1991096, at *3 (S.D.N.Y. May 6, 2008) ("It is 'axiomatic' that a party to an agreement has standing to sue a counter-party who breaches that agreement, even where some or all of the benefits of that contract accrue to a third party. …[The union's] interest in enforcement is based not merely on the formality that [the union] is a party to the contract, but also on the undeniable 'interest unions have in assuring that negotiated retirement benefits are in fact paid and administered in accordance with the terms and intent of their contracts.'") (quoting *Allied and Akali Workers of Am., Local Union No. 1 v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 176 n.17 (1971)).

  Here, the Union's complaint alleges that the current (unexpired) CBA contains provisions providing during the term of that agreement certain health benefits to former employees who retired prior to the effective date of the CBA, and that, prior to the expiration of the current CBA, Defendants unilaterally discontinued those benefits in breach of their contractual obligations.  Given these allegations, we hold that the Union, as a party to that contract with a legally protected interest in the CBA, has standing to sue Defendants under § 301 for the alleged breach of the agreement's provisions as the Union negotiated for the health care benefits for the Retirees and is entitled to the benefit of its

11

bargain, Defendants' unilateral discontinuation of the benefits, if in breach of the CBA, will cause the Union's injury, and a decision declaring that the CBA obligates Defendants to continue providing the benefits for the term of the agreement will redress that injury.

### D. Standing to Compel Arbitration

In Count II of the complaint, the Union alternatively seeks to compel arbitration of its grievance regarding the unilateral discontinuation of the Retirees' health care benefits, pursuant to § 301 of the LMRA. Defendants argue that the Union does not have standing to compel arbitration because it has grieved an "inapplicable contract," to wit, the current CBA, which Defendants contend applies only to current employees during its term and therefore is not operative to cover any of the affected Retirees.

As detailed above, we have rejected this argument. The Union seeks to arbitrate in its own stead its grievance on the meaning and application of Article X, Section 6 of the current CBA. The Union alleges that it entered into the current CBA with Defendants, which contract includes promises to the Union to provide certain health benefits to individuals who had retired prior to the effective date of the agreement (set forth in Article X, Section 6), and that the current CBA includes a procedure by which Defendants agreed to arbitrate disputes with the Union *or* its employees about the meaning or application of those contractual provisions. *See* Exh. A to Compl. at Article IX, Section 1 ("Should differences arise between the Company and the Union or any employee of the Company covered hereunder as to the meaning or application of the provisions of this Agreement, such differences shall be settled [through the grievance procedure]."); *Id.* at Section 1, Step 1 ("The Union or a steward shall have the right to file

12

a grievance alleging a violation of this Agreement."). Under these facts, we find that the Union has adequately established that it has standing to compel arbitration on its own behalf.[2] The cases cited by Defendants to the contrary are inapposite as there was no allegation there, as there is here, that the *current* CBA provided benefits for already-retired employees. *See Paper, Allied-Indus. Chem. & Energy Workers Int'l Union v. UCAR Carbon Co., Clarksburg Works*, 368 F. Supp. 2d 548, 549–50 (N.D. W. Va. 2005); *Crown Cork & Seal Co. v. Int'l Ass'n of Machinists & Aerospace Workers,* No. 8:03CV222, 2005 WL 2076542, at *1–*2, *7 (D. Neb. Aug. 26, 2005).

### III.   Inability to Pursue the Relief Sought

Defendants also seek judgment on the pleadings on the grounds that the Union cannot pursue the relief sought in the complaint. However, Defendants' arguments in this regard are all premised on the Union's lack of standing. Because we have found for the reasons detailed above that the Union does have standing to pursue its § 301 claims, we do not further address Defendants' arguments otherwise.

---

[2] The parties have not briefed whether the "consent rule" as set forth in *Rosetto v. Pabst Brewing Co., Inc.*, 128 F.3d 538, 539–40 (7th Cir. 1997), which requires that a union obtain the consent of affected retirees before it has standing to arbitrate a grievance on their behalf, applies to a grievance brought on a union's own behalf, as the Union alleges it seeks to arbitrate here. *See Comm'ns Workers of Am. and its Local 7270 v. Frontier Comm'ns of Minnesota Inc.*, No. 18-650 (DWF/SRN), 2008 WL 3896153, at *3–*4 (D. Minn. Aug. 19, 2008) (concluding that "the Union has standing to seek to vindicate its own contractual rights under the Agreement without obtaining the consent of affected retirees" because the agreement, unlike that at issue in *Rosetto*, "specifically grants the Union the right to pursue a grievance and, if necessary, arbitration on its own behalf"). Accordingly, we do not address that issue at this juncture.

### IV. Conclusion

For the reasons detailed above, Defendants' Motion for Judgment on the Pleadings [Dkt. 18] is <u>DENIED</u>. The case shall proceed accordingly.

IT IS SO ORDERED.

Date:     3/31/2025

*Sarah Evans Barker*

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Adam York Decker
JOHNSON & KROL, LLC
decker@johnsonkrol.com

Suzanne C. Dyer
JOHNSON & KROL, LLC
dyer@johnsonkrol.com

Christina M Janice
Barnes & Thornburg LLP
christina.janice@btlaw.com

Karl E. Masters
GREGORIO & ASSOCIATES
masters@johnsonkrol.com

David J. Pryzbylski
BARNES & THORNBURG, LLP (Indianapolis)
dpryzbylski@btlaw.com

Colleen Elizabeth Schade
BARNES & THORNBURG, LLP (Indianapolis)
colleen.schade@btlaw.com

Kenneth J. Yerkes
BARNES & THORNBURG, LLP (Indianapolis)
ken.yerkes@btlaw.com